### UNITED STATES BANKRUPTCY COURT
### NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | Bankruptcy No. 09 B 07578 |
| | ) | Chapter 7 |
| THOMAS LOTHAR GELHAAR, | ) | Judge John H. Squires |
| | ) | |
| Debtor. | ) | |
| | ) | |
| ———————————— | ) | |
| GUS ROSE, | ) | |
| | ) | Adversary No. 09 A 00504 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| THOMAS LOTHAR GELHAAR, | ) | |
| | ) | |
| Defendant. | ) | |

### MEMORANDUM OPINION

This matter comes before the Court on the amended complaint filed by Gus Rose (the "Creditor") against Thomas Lothar Gelhaar (the "Debtor") seeking to except a debt from discharge pursuant to 11 U.S.C. § 523(a)(2)(A) and § 523(a)(6).[1] For the reasons set forth herein, the Court finds that the Creditor has failed to demonstrate by a preponderance of the evidence that the debt is non-dischargeable under § 523(a)(2)(A) or § 523(a)(6).

---

[1] The amended complaint also seeks a finding that the debt be found non-dischargeable under 11 U.S.C. § 523(a)(4). At trial, the Court granted the Debtor's motion for a directed finding pursuant to Federal Rule of Bankruptcy Procedure 7052 with respect to the § 523(a)(4) claim. The Court found that the evidence did not establish the requisite fiduciary relationship between the Debtor and the Creditor. Thus, the Court need not address the § 523(a)(4) claim in this Memorandum Opinion.

-2-

# I.  JURISDICTION AND PROCEDURE

The Court has jurisdiction to entertain this matter pursuant to 28 U.S.C. § 1334 and Internal Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois.  It is a core proceeding under 28 U.S.C. § 157(b)(2)(I).

# II.  FACTS AND BACKGROUND

The Creditor is the father of Michael Rose ("Michael").  Michael and the Debtor were childhood friends.  The Debtor often visited Michael's home and socialized with him and the Creditor.  Michael worked for several years in the retail automobile business prior to 2001.

On August 6, 2001, Rose Motors, Inc. ("Rose Motors") was incorporated in Illinois for the purpose of purchasing used cars at wholesale prices and reselling them at retail prices. Michael and the Debtor were the incorporators of the business.  At the time Rose Motors was incorporated, Michael and the Debtor were each fifty percent shareholders of the company. (Creditor Ex. B.)

Michael testified that he was to contribute his experience in the car business and the Debtor was to contribute the start-up capital to Rose Motors.  Michael further testified that he was the president of the business from its inception until early 2006.  (*See* Debtor Ex. B.) Michael purchased the automobiles for Rose Motors and was a salesman.  According to Michael, the Debtor held the position of secretary for Rose Motors, and he handled all of the financial affairs of the business, including the checking accounts.  Kelly Kleamankos ("Kelly"), the part-time automobile title clerk at Rose Motors, also testified that the Debtor was responsible for all of the company's finances.  The Debtor and Michael were two of the

-3-

authorized signers on the two checking accounts that Rose Motors held at West Suburban

Bank. (Creditor Exs. N-R.)

In 2004, Michael and the Debtor desired to increase Rose Motors' inventory and

expand the business. Michael asked his father, the Creditor, to lend money to Rose Motors.

According to Michael, the Debtor was aware that Michael was going to ask the Creditor for

a business loan. The Creditor testified that in late 2004, he loaned the sum of $30,000 to

Rose Motors for the purpose of expanding its inventory. According to the Creditor, the

agreement was that he was to be paid interest at the rate of fifteen percent per annum. The

loan was not reduced to writing at the time it was made.

In April 2005, Rose Motors needed additional money. Michael testified that he and

the Debtor again discussed the idea of asking the Creditor for a loan. Subsequently, Michael

went to the Creditor and requested that he lend an additional $60,000 to Rose Motors under

the same terms as those for the previous loan. In May 2005, Michael, the Creditor, and the

Debtor met at Rose Motors. At this meeting, a promissory note for $60,000 and a security

agreement, pledging all of Rose Motors' assets to secure the repayment of the loan, were

executed. (Creditor Exs. E & F.) Michael signed the promissory note in his capacity as

president of Rose Motors, and the Debtor signed the note in his capacity as secretary.

(Creditor Ex. E.) The security agreement was signed by Michael, but the Debtor refused to

sign that document. (Creditor Ex. F.) The $30,000 loan that the Creditor had previously

made to Rose Motors was also documented at this time. (Creditor Exs. C & D.) Michael

signed a promissory note in his capacity as president of Rose Motors for the $30,000 loan

the Creditor made. (Creditor Ex. C.) In addition, a security agreement pledging all of Rose

-4-

Motors' assets to secure the repayment of the $30,000 loan was executed by Michael. (Creditor Ex. D.) According to Michael, the Debtor refused to sign either the promissory note or the security agreement with respect to the $30,000 loan. Neither the documentary evidence nor the trial testimony revealed the Debtor's reasons for refusing to sign these documents.

Rose Motors made several monthly interest payments to the Creditor on both loans. (Creditor Exs. G & H.) The checks were signed by the Debtor on behalf of Rose Motors.

The Creditor did not record UCC-1 financing statements to perfect his security interests.[2] He testified that once the notes and security agreements were signed, he placed them in a file; he said he did not know that they had to be recorded or filed with the Illinois Secretary of State in order to be perfected.

Michael testified that at the meeting at which he, the Debtor, and the Creditor were present, they agreed that the Creditor would receive fifteen percent interest on the $60,000 loan, the same rate he was receiving on the $30,000 loan. Both Michael and the Creditor testified that the Debtor did not make any representations to the Creditor regarding Rose Motors. In fact, the Creditor admitted that, prior to making either loan to Rose Motors, he did not speak to the Debtor and the Debtor did not make any promises to him regarding the

---

[2] The Creditor's failure to perfect his lien by filing UCC-1 financing statements does not affect the enforceability of the security interests as between Rose Motors and the Creditor. *See Barber v. Reynolds Motor Leasing Co. (In re My Type, Inc.)*, Nos. 05-83236, 07-8183, 2009 WL 150625, at *1 (Bankr. C.D. Ill. Jan. 21, 2009) (*citing In re Little*, 225 B.R. 593, 595 (Bankr. D.S.C. 1997); *Waukesha State Bank v. Sindic (In re Sindic)*, 44 B.R. 167, 172 (Bankr. E.D. Wis. 1984)). The validity of a security agreement is not dependent on perfection. *CLM Ins. Agency, Inc. v. Krause (In re Krause)*, 114 B.R. 582, 595 (Bankr. N.D. Ind. 1988) (*citing First Galesburg Nat'l Bank & Trust Co. v. Martin*, 373 N.E.2d 1075 (Ill. App. Ct. 1978)).

-5-

loans. Rather, all of the Creditor's communications in connection with the loans were with

Michael. According to the Creditor, the sole conversation he had with the Debtor with

respect to the two loans was at the meeting in May 2005 at Rose Motors. The discussion

related only to the amount of interest the Creditor was to receive. Specifically, the Creditor

testified that he was to receive monthly interest payments from Rose Motors for the two

loans in the sum of $1,150. Michael corroborated the Creditor's testimony that the Debtor

never talked to the Creditor about the loans.

Some time after Rose Motors was incorporated, James Gelhaar ("James"), the

Debtor's brother, joined the business at Rose Motors. According to James, he and the Debtor

purchased the lease at the location in Roselle, Illinois, where Rose Motors was operating.

(*See* Debtor Ex. A.) Shortly thereafter, James made a capital contribution to Rose Motors

and then became a one-third shareholder with Michael and the Debtor. James testified that

he made investments in Rose Motors totaling approximately $120,000. He ran the service

area of the company where he, among other things, repaired and inspected the vehicles and

ordered parts for those vehicles.

Michael and James testified that Rose Motors obtained floorplan financing from

Automotive Finance Corporation ("AFC") for purchasing used vehicles at wholesale prices

for resale by the company. Michael and the Debtor signed the AFC financing documents in

their corporate capacities and also signed as guarantors. (Debtor Ex. D.) AFC perfected its

security interest in Rose Motors' inventory by filing its UCC-1 financing statement on March

10, 2004. (Debtor Ex. C.) James testified that Rose Motors also had a floorplan financing

agreement with Manheim Automotive Financial Services, Inc. ("MAFS"). MAFS perfected

-6-

its security interest in Rose Motors' inventory by filing a UCC-1 financing statement with the Illinois Secretary of State on August 3, 2004. (*Id.*) According to James, Rose Motors often made wire transfers to AFC and MAFS to ensure that the company's line of credit remained available.

James testified that Rose Motors began to experience financial problems shortly after operations began. Bills were not being paid on time, and checks written on the company's accounts were being returned for insufficient funds. As a result, James stated, certain creditors and vendors demanded that Rose Motors pay them in cash. According to James, for example, the Illinois Secretary of State and the Illinois Department of Revenue were often paid by cashier's checks or cash. Kelly, the automobile title clerk at Rose Motors, testified that in 2004 and 2005, when she registered title transfers and obtained license plates for vehicles, she would take cash to pay for such transactions because Rose Motors' checks were not accepted. According to Kelly, she would handle, on average, five to ten transactions per week and would take approximately $2,000 in cash with her to pay for these transactions.

As a result of Rose Motors' financial troubles, James testified that both he and the Debtor made several short-term loans to the company to cover its debts. Rose Motors would repay both James and the Debtor for these short-term loans as funds became available. In addition, James stated that he took a second mortgage on his home through a company named Upland Mortgage in order to provide more capital to the company. According to both Michael and James, Michael's girlfriend Sherry Benson ("Sherry") also made loans to Rose Motors in early 2005. James testified that she would take advances on her Bank of America credit card and Rose Motors would make the payments she owed on that card directly to the

credit card company. James further stated that Rose Motors did not pay his or the Debtor's credit card debts.

Michael testified, based on his review of the two accounts Rose Motors held at West Suburban Bank, that the company's gross revenues from January 2005 through March 2006 were approximately $3,000,000. During that same time period, the Debtor withdrew, via check or wire transfer from Rose Motors' two accounts at the bank, approximately $1,300,000. (Creditor Exs. S & T.) James testified that all wire transfers went to Rose Motors' floorplan finance companies in order to ensure full payment of the monthly audits and to keep the line of credit open. Further, James testified that all payments to him and to the Debtor, as well as all wire transfers and cash transactions, were for legitimate business purposes.

In 2005, Rose Motors made payments to the Illinois State Disbursement Unit, a processing center for all Illinois child support payments. The checks totaled $2,872. (Creditor Ex. V.) Michael testified that Rose Motors did not have any business with this creditor. He stated, however, that the Debtor had an ex-wife and several children and that he was required to pay child support.

Michael also testified that on numerous occasions he observed the Debtor in his office using the company computer to gamble. Michael stated that the Debtor would spend several hours each day playing online poker. According to Michael, James also utilized the company computer to gamble. There was no evidence adduced at trial, however, to show that either the Debtor or James used company funds to gamble.

-8-

In December 2005, the interest payments to the Creditor fell behind by two months. The Debtor issued a check to the Creditor for those two months of interest and gave it to Michael. The Debtor asked Michael to hold the check until funds were available to cover it. Michael went to West Suburban Bank with the Creditor in March 2006 to present the check for payment. The bank refused to honor the check and Michael was told that he had been removed as an authorized signer on the account. When Michael called the Debtor to inquire as to why the check would not clear, the Debtor said simply that he was not going to pay any further monies to the Creditor.

Michael testified that in late 2005, Rose Motors did not have enough money to pay his salary. As a result, Michael agreed to forgo a paycheck for a few months. By February 2006, after selling certain personal belongings, Michael was broke. In March 2006, he left Rose Motors.

In October 2006, Rose Motors ceased doing business. According to James, Rose Motors sold its lease at that time and received approximately $20,000. James testified that all of that money was used to pay the Illinois Secretary of State and the Department of Motor Vehicles. According to James, the Debtor retained certain assets of Rose Motors, including several "buy here-pay here" contracts. The Debtor collected the revenues from these contracts and use them to pay his and James's sister. James explained that his sister lent money to Rose Motors to cover the taxes for the vehicle sales and the license plate transfers. She was to be paid back as soon as funds became available.

After Rose Motors ceased doing business, James stated that AFC, pursuant to its security interest, took possession of all of the vehicle inventory, liquidated that inventory,

-9-

and applied the money to the amount owed to AFC by Rose Motors. After the liquidation

of the vehicle inventory, there was an outstanding balance owed to AFC of approximately

$77,000. (*See* Debtor Ex. F.) Rose Motors was eventually dissolved on January 2, 2007.

(Creditor Ex. I.)

The Creditor sued the Debtor and Rose Motors in 2007 for non-payment of the loans

owed to him. The Creditor obtained a judgment in the sum of $140,483.26 against the

Debtor in the Circuit Court for the Eighteenth Judicial Circuit, DuPage County, on April 23,

2008. (Creditor Ex. A.) The state court judgment order specifically found as follows:

> Rose Motor's, [sic] Inc. was the facade for the operation of
> the dominant stockholder [the Debtor], there was a unity of
> interest and ownership between [the Debtor] and Rose
> Motor's, [sic] Inc. such that the separate personalities of the
> corporation and the individual no longer exist, and Rose
> Motor's, [sic] Inc. was the alter ego of [the Debtor]; and . . .
> adherence to the fiction of a separate corporate existence
> between Rose Motor's, [sic] Inc. and [the Debtor] would
> sanction a fraud and promote injustice.

(*Id.*)

The Debtor filed a Chapter 7 bankruptcy petition on March 6, 2009. Thereafter, on

June 22, 2009, the Creditor filed the instant adversary proceeding. In the amended

complaint, the Creditor alleges that the Debtor diverted monies and property of Rose Motors

to himself without making payment to the Creditor. The Creditor avers that such diversion

of monies and property constitutes false pretenses. Additionally, the Creditor alleges that the

Debtor made several express or implied representations to him that were false and created

a misleading understanding of the transactions. As a result, the Creditor maintains that he

-10-

was wrongfully induced to lend money to Rose Motors. Accordingly, the Creditor contends

that the judgment debt should be found non-dischargeable under § 523(a)(2)(A).

Alternatively, the Creditor alleges that the Debtor willfully and maliciously injured

him when the Debtor used Rose Motors' money for purposes other than to pay the Creditor.

According to the Creditor, to the extent that monies were diverted to the Debtor and James,

the Debtor violated the promissory notes and security agreements. Further, the Creditor

states that the Debtor's failure to pay him was without just cause and harmed him. As a

result, the Creditor seeks a finding that the debt is non-dischargeable under § 523(a)(6).

The Court held an evidentiary hearing in this matter. The Creditor, Michael, James,

and Kelly testified. The Debtor did not testify. Thereafter, the Court took the matter under

advisement.

## III. APPLICABLE STANDARDS

### A.    Exceptions to the Discharge of a Debt

The discharge provided by the Bankruptcy Code is meant to effectuate the "fresh

start" goal of bankruptcy relief. *Vill. of San Jose v. McWilliams*, 284 F.3d 785, 790 (7th Cir.

2002). The party seeking to establish an exception to the discharge of a debt bears the

burden of proof. *Goldberg Sec., Inc. v. Scarlata (In re Scarlata)*, 979 F.2d 521, 524 (7th Cir.

1992); *Banner Oil Co. v. Bryson (In re Bryson)*, 187 B.R. 939, 957 (Bankr. N.D. Ill. 1995).

The United States Supreme Court has held that the burden of proof required to establish an

exception to discharge is a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279,

291 (1991). *See also In re McFarland*, 84 F.3d 943, 946 (7th Cir. 1996); *In re Thirtyacre*,

-11-

36 F.3d 697, 700 (7th Cir. 1994). Exceptions to discharge are to be construed strictly against

a creditor and liberally in favor of a debtor. *In re Morris*, 223 F.3d 548, 552 (7th Cir. 2000);

*Kolodziej v. Reines (In re Reines)*, 142 F.3d 970, 972-73 (7th Cir. 1998). "[Section 523(a)]

is narrowly construed so as not to undermine the Code's purpose of giving the honest but

unfortunate debtor a fresh start." *Park Nat'l Bank & Trust of Chi. v. Paul (In re Paul)*, 266

B.R. 686, 693 (Bankr. N.D. Ill. 2001).

**B.    11 U.S.C. § 523(a)(2)(A)**

Section 523 of the Bankruptcy Code enumerates specific, limited exceptions to the

dischargeability of debts.  Section 523(a)(2)(A) provides as follows:

> (a) A discharge under section 727 . . . does not discharge an
> individual debtor from any debt–
>
> . . .
>
> (2) for money, property, services, or an
> extension, renewal, or refinancing of credit, to
> the extent obtained by–
>> (A) false pretenses, a false
>> representation, or actual fraud,
>> other than a statement
>> respecting the debtor's or an
>> insider's financial condition[.]

11 U.S.C. § 523(a)(2)(A). This section lists three separate grounds for dischargeability: false

pretenses, false representation, and actual fraud. *Id.* The amended complaint alleges that the

Debtor made false representations and induced the Creditor to extend the loans through false

pretenses.  In his closing brief, the Creditor argues that the Debtor's actions also fall under

the rubric of fraud.[3]  Thus, the Court will address each prong of the statutory exception.

---

[3] The Debtor objects to the Creditor's fraud argument on the ground that this theory
was never alleged in the amended complaint or raised in the pre-trial statement.
     Federal Rule of Bankruptcy Procedure 7015, which incorporates Federal Rule of Civil

-12-

## 1. False pretenses or false representation

In order to except a debt from discharge based on false pretenses or false representation, the creditor must establish the following elements: (1) the debtor made a false representation of fact; (2) which the debtor (a) either knew to be false or made with reckless disregard for its truth and (b) made with an intent to deceive; and (3) the creditor justifiably relied on the false representation. *Ojeda v. Goldberg*, 599 F.3d 712, 716-17 (7th Cir. 2010); *Wallner v. Liebl (In re Liebl)*, 434 B.R. 529, 538-39 (Bankr. N.D. Ill. 2010); *Baker Dev. Corp. v. Mulder (In re Mulder)*, 307 B.R. 637, 643 (Bankr. N.D. Ill. 2004). To prevail on a § 523(a)(2)(A) complaint, all three elements must be established. *Glucona Am., Inc. v. Ardisson (In re Ardisson)*, 272 B.R. 346, 357 (Bankr. N.D. Ill. 2001). Failure to establish any one fact is outcome determinative. *Bletnitsky v. Jairath (In re Jairath)*, 259 B.R. 308, 314 (Bankr N.D. Ill. 2001).

---

Procedure 15, governs the amendment of pleadings. "'[T]he Federal Rules of Civil Procedure create [a system] in which the complaint does not fix the plaintiff's rights but may be amended at any time to conform to the evidence.'" *Winger v. Winger*, 82 F.3d 140, 144 (7th Cir. 1996) (*quoting Duckworth v. Franzen*, 780 F.2d 645, 649 (7th Cir. 1985)). Rule 15(b)(2) provides in pertinent part that "[w]hen an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings." Fed. R. Civ. P. 15(b)(2). In determining whether there was implied consent, a court must determine "whether the opposing party had a fair opportunity to defend and whether he could have presented additional evidence had he known sooner the substance of the amendment." *Rivinius, Inc. v. Cross Mfg., Inc. (In re Rivinius, Inc.)*, 977 F.2d 1171, 1175 (7th Cir. 1992) (internal quotation omitted).

In this matter, the Court finds that the issue of whether the Creditor's debt should be found non-dischargeable as a result of the Debtor's actual fraud was tried by implied consent. The Debtor had a full and fair opportunity to defend against the allegation. Because the issue was tried by implied consent, formal amendment of the Creditor's complaint is not necessary. *See Winger*, 82 F.3d at 144; *Burdett v. Miller*, 957 F.2d 1375, 1380 (7th Cir. 1992).

-13-

False pretenses in the context of § 523(a)(2)(A) include implied misrepresentations or conduct intended to create or foster a false impression. *Mem'l Hosp. v. Sarama (In re Sarama)*, 192 B.R. 922, 927 (Bankr. N.D. Ill. 1996). The Court has defined false pretenses as follows:

> [A] series of events, activities or communications which, when considered collectively, create a false and misleading set of circumstances, or false and misleading understanding of a transaction, in which a creditor is wrongfully induced by the debtor to transfer property or extend credit to the debtor....
>
> A false pretense is usually, but not always, the product of multiple events, acts or representations undertaken by a debtor which purposely create a contrived and misleading understanding of a transaction that, in turn, wrongfully induces the creditor to extend credit to the debtor. A "false pretense" is established or fostered willfully, knowingly and by design; it is not the result of inadvertence.

*Sterna v. Paneras (In re Paneras)*, 195 B.R. 395, 406 (Bankr. N.D. Ill. 1996) (*quoting Evans v. Dunston (In re Dunston)*, 117 B.R. 632, 641 (Bankr. D. Colo. 1990), *aff'd in part, rev'd in part*, 146 B.R. 269 (D. Colo. 1992)). *Accord John Deere Co. v. Broholm (In re Broholm)*, 310 B.R. 864, 872 (Bankr. N.D. Ill. 2004) (*quoting Paneras*).

False pretenses do not necessarily require overt misrepresentations. *Sarama*, 192 B.R. at 928. "Instead, omissions or a failure to disclose on the part of the debtor can constitute misrepresentations where the circumstances are such that omissions or failure to disclose create a false impression which is known by the debtor." *Id.* Silence or concealment may constitute false pretenses. *Shelby Shore Drugs, Inc. v. Sielschott (In re Sielschott)*, 332 B.R. 570, 573 (Bankr. C.D. Ill. 2005); *Fosco v. Fosco (In re Fosco)*, 289 B.R. 78, 86 (Bankr. N.D. Ill. 2002).

-14-

In contrast, a false representation is an express misrepresentation that can be demonstrated either by a spoken or written statement or through conduct. *New Austin Roosevelt Currency Exch. v. Sanchez (In re Sanchez)*, 277 B.R. 904, 908 (Bankr. N.D. Ill. 2002). "A debtor's silence regarding a material fact can constitute a false representation under § 523(a)(2)(A)." *Health Benefit Plan v. Westfall (In re Westfall)*, 379 B.R. 798, 803 (Bankr. C.D. Ill. 2007). The failure to disclose pertinent information may be a false representation where the circumstances imply a specific set of facts and disclosure is necessary to correct what would otherwise be a false impression. *Trizna & Lepri v. Malcolm (In re Malcolm)*, 145 B.R. 259, 263 (Bankr. N.D. Ill. 1992).

### 2. Actual fraud

The Seventh Circuit Court of Appeals has defined the term "fraud" for purposes of § 523(a)(2)(A) as follows:

> 'Fraud is a generic term, which embraces all the multifarious means which human ingenuity can devise and which are resorted to by one individual to gain an advantage over another by false suggestions or by the suppression of truth. No definite and invariable rule can be laid down as a general proposition defining fraud, and it includes all surprise, trick, cunning, dissembling, and any unfair way by which another is cheated.'

*McClellan v. Cantrell*, 217 F.3d 890, 893 (7th Cir. 2000) (*quoting Stapleton v. Holt*, 250 P.2d 451, 453-54 (Okla. 1952)). "Actual fraud" is not limited to misrepresentation, but may encompass "any deceit, artifice, trick, or design involving direct and active operation of the mind, used to circumvent and cheat another[.]" *Id.* (internal quotation omitted). Hence, a different analysis must be utilized when a creditor alleges actual fraud. *Id.* The *McClellan*

-15-

court opined that because common law fraud does not always take the form of a misrepresentation, a creditor need not allege misrepresentation and reliance thereon to state a cause of action for actual fraud under § 523(a)(2)(A). *Id.* at 894. Rather, the creditor must establish the following: (1) a fraud occurred; (2) the debtor intended to defraud the creditor; and (3) the fraud created the debt that is the subject of the discharge dispute. *Id.*; *Liebl*, 434 B.R. at 538. The fraud exception under § 523(a)(2)(A) does not reach constructive frauds, only actual ones. *McClellan*, 217 F.3d at 894. The existence of fraud may be inferred if the totality of the circumstances presents a picture of deceptive conduct by the debtor that indicates he intended to deceive or cheat the creditor. *Cripe v. Mathis (In re Mathis)*, 360 B.R. 662, 666 (Bankr. C.D. Ill. 2006); *Sielschott*, 332 B.R. at 572.

### 3. Intent

Any cause of action under § 523(a)(2)(A)–false pretenses, false representation, or actual fraud– requires proof that the debtor acted with intent to deceive. *Pearson v. Howard (In re Howard)*, 339 B.R. 913, 919 (Bankr. N.D. Ill. 2006). Proof of intent to deceive is measured by the debtor's subjective intention at the time the representation was made. *CFC Wireforms, Inc. v. Monroe (In re Monroe)*, 304 B.R. 349, 356 (Bankr. N.D. Ill. 2004); *Mega Marts, Inc. v. Trevisan (In re Trevisan)*, 300 B.R. 708, 717 (Bankr. E.D. Wis. 2003). It is well established, however, that courts can consider subsequent conduct as long as that conduct provides an indication of the debtor's state of mind at the time of the actionable representations. *6050 Grant, LLC v. Hanson (In re Hanson)*, 437 B.R. 322, 327-28 (Bankr. N.D. Ill. 2010) (collecting cases).

-16-

Determining whether a debtor had the requisite intent under § 523(a)(2)(A) is, therefore, a factual, subjective inquiry decided by examining all of the relevant circumstances, including those that took place after the debt was incurred. *Id.* at 328; *see also Howard*, 339 B.R. at 919; *Sears, Roebuck & Co. v. Green (In re Green)*, 296 B.R. 173, 179 (Bankr. C.D. Ill. 2003). Because a debtor will rarely, if ever, admit to acting with an intent to defraud, the scienter element may be inferred from the surrounding circumstances. *Hickory Point Bank & Trust, FSB v. Kucera (In re Kucera)*, 373 B.R. 878, 884 (Bankr. C.D. Ill. 2007); *Rezin v. Barr (In re Barr)*, 194 B.R. 1009, 1020 (Bankr. N.D. Ill. 1996). "Where a person knowingly or recklessly makes false representations which the person knows or should know will induce another to act, the finder of fact may logically infer an intent to deceive." *Jairath*, 259 B.R. at 315. After all of the evidence has been produced, the court must then determine whether the circumstances, viewed in the aggregate, present "a picture of deceptive conduct" by the debtor, indicating an intent to defraud the creditor. *See Mathis*, 360 B.R. at 666; *Sielschott*, 332 B.R. at 572.

### 4. Justifiable reliance

The final element under § 523(a)(2)(A) requires a finding of causation. Reliance on a false pretense, false representation, or actual fraud under § 523(a)(2)(A) must be "justifiable." *Field v. Mans*, 516 U.S. 59, 74-75 (1995). Justifiable reliance is a less demanding standard than reasonable reliance and requires only that the creditor did not "blindly [rely] upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation." *Id.* at 71 (internal quotation omitted). Justifiable reliance is an intermediate level of reliance that falls

-17-

somewhere between the stringent "reasonable reliance" guidepost and the lenient "reliance in fact." *Id.* at 74-75.

The justifiable reliance standard imposes no duty to investigate unless the falsity of the representation is readily apparent. *Id.* at 70-72. Whether a party justifiably relies on a misrepresentation is determined by looking at the circumstances of a particular case and the characteristics of a particular plaintiff, not by an objective standard. *Id.* at 71; *Bombardier Capital, Inc. v. Dobek (In re Dobek)*, 278 B.R. 496, 508 (Bankr. N.D. Ill. 2002). "[A] person is justified in relying on a representation of fact 'although he might have ascertained the falsity of the representation had he made an investigation.'" *Mercantile Bank v. Canovas*, 237 B.R. 423, 429 (Bankr. N.D. Ill. 1998) (*quoting Field v. Mans*, 516 U.S. at 70). "However, a 'plaintiff may not bury his head in the sand and willfully ignore obvious falsehoods.'" *Johnston v. Campbell (In re Campbell)*, 372 B.R. 886, 892 (Bankr. C.D. Ill. 2007) (*quoting Zirkel v. Tomlinson (In re Tomlinson)*, Nos. 96 B 27172, 96 A 1539, 1999 WL 294879, at *12 (Bankr. N.D. Ill. May 10, 1999)).

To satisfy the reliance element of § 523(a)(2)(A), the creditor must show that the debtor made a material misrepresentation that was the cause-in-fact of the debt that the creditor wants excepted from discharge. *Mayer v. Spanel Int'l Ltd. (In re Mayer)*, 51 F.3d 670, 676 (7th Cir. 1995) ("Reliance means the conjunction of a material misrepresentation with causation in fact."). *See also Westfall*, 379 B.R. at 805 (*citing Mayer*).

-18-

## C.     11 U.S.C. § 523(a)(6)

Section § 523(a)(6) of the Bankruptcy Code provides as follows:

> (a) A discharge under section 727 . . . does not discharge an
> individual debtor from any debt–
>
> .   .   .
>
> (6) for willful and malicious injury by the
> debtor to another entity or to the property of
> another entity[.]

11 U.S.C. § 523(a)(6).

For a finding of non-dischargeability of a debt under § 523(a)(6), a creditor must

prove three elements by a preponderance of the evidence: (1) that the debtor intended to and

caused an injury to the creditor's person or property interest; (2) that the debtor's actions

were willful; and (3) that the debtor's actions were malicious. *Birriel v. Odeh (In re Odeh)*,

431 B.R. 807, 817 (Bankr. N.D. Ill. 2010); *Mut. Mgmt. Servs., Inc. v. Fairgrieves (In re

Fairgrieves)*, 426 B.R. 748, 756 (Bankr. N.D. Ill. 2010); *Mulder*, 307 B.R. at 641.

"Injury" has been defined as "the violation of another's legal right or the infliction

of an actionable wrong." *Fairgrieves*, 426 B.R. at 757. Injuries contemplated by § 523(a)(6)

are not confined to physical damage. *Id.* An injury to intangible personal or property rights

will suffice. *Id.*

"The word 'willful' in [§ 523](a)(6) modifies the word 'injury,' indicating that

nondischargeability takes a deliberate or intentional *injury*, not merely a deliberate or

intentional *act* that leads to injury." *Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998)

(emphasis in original). Under *Geiger* and its stringent standards, to satisfy the requirements

of § 523(a)(6), a creditor must plead and prove that the debtor actually intended to harm him

-19-

and not merely that the debtor acted intentionally and he was thus harmed. *See id.* at 61-62.

In other words, the debtor must have intended the tortious consequences of his act. *See id.*;

*see also Berkson v. Gulevsky (In re Gulevsky)*, 362 F.3d 961, 964 (7th Cir. 2004). Injuries

either negligently or recklessly inflicted do not fall within the ambit of § 523(a)(6). *Geiger*,

523 U.S. at 64.

The Supreme Court has not defined the scope of the term "intent" utilized to describe

willful conduct. *Fairgrieves*, 426 B.R. at 757; *Zamora v. Jacobs (In re Jacobs)*, 403 B.R.

565, 581 (Bankr. N.D. Ill. 2009). Recent decisions, however, have generally found that

either a showing of subjective intent to injure the creditor or a showing of subjective

knowledge by the debtor that injury is substantially certain to result from his acts can

establish the requisite intent required by *Geiger*. *Fairgrieves*, 426 B.R. at 757 (collecting

cases).

As to the malice element, conduct is "malicious" if it is taken "in conscious disregard

of one's duties or without just cause or excuse. . . ." *Thirtyacre*, 36 F.3d at 700 (internal

quotation omitted). The test for maliciousness under § 523(a)(6) is: (1) a wrongful act, (2)

done intentionally, (3) which causes injury to the creditor, and (4) is done without just cause

and excuse. *Paul*, 266 B.R. at 696. A debtor does not have to act with ill will or a specific

intent to do harm to the creditor for the conduct to be malicious. *Thirtyacre*, 36 F.3d at 700.

The key to maliciousness is consciousness of wrongdoing. *Centier Bank v. Young (In re

Young)*, 428 B.R. 804, 818 (Bankr. N.D. Ind. 2010). Whether an actor behaved willfully and

maliciously is ultimately a question of fact reserved for the trier of fact. *Thirtyacre*, 36 F.3d

at 700. Because a person will rarely admit to acting in a willful and malicious manner, those

-20-

requirements must be inferred from the circumstances surrounding the injury. *Cutler v. Lazzara (In re Lazzara)*, 287 B.R. 714, 723 (Bankr. N.D. Ill. 2002).

## IV. DISCUSSION

### A.    Section 523(a)(2)(A)

The Creditor alleges in the amended complaint that prior to making the loans to Rose Motors, the Debtor made the following express or implied representations that were false: (1) the money that the Creditor was to lend to the company would be used to purchase cars and expand the business; (2) there were two owners of the business–the Debtor and Michael; (3) Rose Motors operated as a corporation utilizing ordinary corporate practices; and (4) the loans were secured by the assets of Rose Motors.  According to the Creditor, these representations were false for the following reasons: (1) some of the money loaned by the Creditor was used to pay penalties that the Debtor had incurred as a result of improper collection of sales taxes on automobile sales; (2) there were three owners of Rose Motors–the Debtor, James, and Michael; (3) the Debtor intentionally diverted large sums of money and personal property of Rose Motors to himself and James; (4) the Debtor failed to properly perfect the Creditor's security interest by recording a UCC-1 financing statement with the Illinois Secretary of State; and (5) the Debtor failed to inform the Creditor that he was closing Rose Motors so that the Creditor could recover assets of the corporation on which he was supposed to have a lien.[4]

------

[4] Although the Creditor argues that some of the money he loaned was used to pay penalties and that the Debtor failed to inform him that Rose Motors would be closing, these allegations were neither discussed nor developed.  In any event, as discussed *infra*, the

-21-

The Court finds that the Creditor has failed to establish that the Debtor made a false representation of fact for purposes of § 523(a)(2)(A). The Creditor candidly testified that he did not discuss the loans he made to Rose Motors with the Debtor. Michael corroborated the Creditor's testimony on this point. Rather, all discussions regarding the loans were between Michael and the Creditor. The evidence showed that there was a meeting at Rose Motors in May 2005, after the Creditor agreed to extend the second loan. The Creditor, the Debtor, and Michael were present at this meeting. The Creditor admitted that the only topic he discussed with the Debtor at the meeting was the amount of monthly interest he was to be paid on the two loans. The Creditor stated that the Debtor did not make any representations to him regarding the company or the loans.

Despite the Creditor's testimony, he alleges that the Debtor made a false representation to him regarding the ownership of Rose Motors. Specifically, the Creditor testified that he thought Michael and the Debtor were the sole owners of Rose Motors. According to the Creditor, if he had known that James was also involved with the company, he would not have made the loans to Rose Motors. The Creditor admitted, however, that his understanding of the ownership interests in Rose Motors came from Michael, not the Debtor. In fact, the Creditor acknowledged that the Debtor did not make any representations to him regarding the ownership of the company. The Creditor simply failed to produce any evidence to show that the Debtor somehow promoted the Creditor's misunderstanding that Michael and the Debtor were the sole shareholders of Rose Motors. Thus, the Court finds that the

---

Debtor and Creditor had no discussions about anything other than the amount of monthly interest on the loans.

Debtor did not make an implied or express misrepresentation to the Creditor regarding the ownership of the company.

The Creditor also argues that the Debtor promoted the false impressions that the money from the Creditor's loans would be used to purchase inventory and that Rose Motors utilized ordinary corporate practices. For the same reasons articulated above, the Court finds that the Creditor failed to adduce any evidence to show that the Debtor made any representation, either express or implied, to the Creditor regarding either the use of the loan proceeds or the business practices of Rose Motors.

Finally, the Creditor maintains that the Debtor willingly promoted the false impression that the loans were secured by Rose Motors' assets. The Debtor signed the $60,000 note (Creditor Ex. E) but refused to sign either the $30,000 note (*see* Creditor Ex. C) or the two security agreements (*see* Creditor Exs. D & F). All of those documents were signed by Michael in his capacity as president of Rose Motors. Further, that the Creditor did not perfect those security interests in Rose Motors' assets was no fault of the Debtor's. The Creditor testified that he did not know he was required to file UCC-1 financing statements in order to perfect his lien. There was no evidence to show that the Debtor made any representations to the Creditor regarding those security agreements. Hence, the Court finds that the Creditor's failure to properly perfect his liens did not result from any false representation made by the Debtor.

Further, the Court finds that the Creditor failed to establish that the Debtor intended to deceive him. There was no direct proof of the Debtor's fraudulent intent, and the Court cannot infer such intent from the surrounding circumstances. The Debtor himself did not

-23-

take the stand; the Creditor testified that he had only one conversation with the Debtor with respect to interest payments; and Michael's testimony, which was clearly biased in favor of the Creditor, failed to shed any light whatsoever on the Debtor's intent. In particular, that the Debtor told Michael he was not going to pay the Creditor any more funds after the bank refused to honor the interest check in December 2005, does not prove by a preponderance of the evidence that the Debtor possessed the requisite intent to deceive. In sum, the evidence, and the lack thereof, failed to present "a picture of deceptive conduct" by the Debtor, thereby indicating an intent to defraud the Creditor. *See Mathis*, 360 B.R. at 666.

Moreover, the Creditor failed to establish justifiable reliance or, in fact, any reliance on the Debtor whatsoever. Because the Debtor did not make any express or implied representations to the Creditor, there could be no reliance, justifiable or otherwise.

The Court further finds that the Creditor failed to establish that the Debtor's conduct constituted actual fraud. The Creditor alleges that the transfer of corporate funds to the Debtor and James, the use of cash in operating the business, the gambling on company time, and the sale of Rose Motors' assets clearly constitute deliberate actions that the Debtor knew would result in the Creditor being cheated. Notwithstanding these allegations, the Creditor did not introduce any evidence to show that the Debtor used surprise, trick, cunning, dissembling, or any deceit, artifice, or design to cheat him. Furthermore, there was no evidence to prove that the Debtor attempted to gain an advantage over the Creditor. As stated above, the Debtor did not make any representations to the Creditor. Moreover, as previously noted, there was no evidence to show that the Debtor somehow suppressed the truth about the ownership of Rose Motors, its business practices, how the loan proceeds were

-24-

to be utilized, or which corporate assets secured the Creditor's loans. All that the evidence really proved is that Rose Motors and the Debtor failed to repay the Creditor's loans and instead paid other creditors of the business. Alleged preferential payments under 11 U.S.C. § 547(b) to the Debtor, James, and others are not the functional equivalent of or synonymous with fraud for purposes of § 523(a)(2)(A).

The Creditor argues that the state court judgment order supports a finding that the debt should be found non-dischargeable under § 523(a)(2)(A). According to the Creditor, to allow the Debtor to "avoid [the Creditor's] debt by filing bankruptcy would make this bankruptcy action an engine of fraud and injustice, which the state court decision would not allow." (Creditor Closing Argument at p. 10 (Docket No. 53).) Ostensibly, the Creditor contends the state court judgment order should be give preclusive effect under the doctrine of collateral estoppel and that this Court must give full faith and credit to that judgment order.

Under Illinois law, the essential elements for application of collateral estoppel are: (1) the issue decided in the prior adjudication must be identical to the issue in the current action; (2) the party against whom the estoppel is asserted must have been a party or in privity with a party to the prior case; and (3) there must have been a final judgment on the merits in the prior action. *Nowak v. St. Rita High Sch.*, 757 N.E.2d 471, 478 (Ill. 2001); *DuPage Forklift Serv., Inc. v. Material Handling Servs., Inc.*, 744 N.E.2d 845, 849 (Ill. 2001). "Detailed findings of fact from the earlier proceeding are necessary to enable the bankruptcy court to determine which issues were actually litigated in the earlier proceeding." *Union Nat'l Bank of Marseilles v. Leigh (In re Leigh)*, 165 B.R. 203, 218 (Bankr. N.D. Ill.

-25-

1993). "In order for a previous judgment to be conclusive, it must appear clearly and certainly that the identical and precise issue was decided in the previous action. The party asserting collateral estoppel bears the burden of showing with clarity and certainty what was determined by the prior judgment. This is a heavy burden of proof." *Benton v. Smith*, 510 N.E.2d 952, 956 (Ill. App. Ct. 1987).

The Court rejects the Creditor's argument. The Court was furnished with only a copy of the state court judgment order (Creditor Ex. A), not a transcript of the evidence offered in those proceedings. The state court found that the Debtor breached the terms of the promissory note and that Rose Motors was the alter ego of the Debtor. (*Id.*)  The fact that the state court pierced the corporate veil and held that Rose Motors was the alter ego of the Debtor, however, does not mean that the Creditor has demonstrated by a preponderance of the evidence the requisite elements under § 523(a)(2)(A). Consequently, the Court cannot give preclusive effect to the judgment order, and that order by itself cannot serve as a basis to except the Creditor's debt from discharge under § 523(a)(2)(A).

In sum, the Court finds that the Creditor's claim under § 523(a)(2)(A) fails because he has not established that the debt at issue resulted from false pretenses, false representation, or actual fraud.

### B.    Section 523(a)(6)

Next, the Creditor alleges that the debt should be found non-dischargeable under § 523(a)(6). The Creditor contends in the amended complaint that the Debtor's use of Rose Motors' money for purposes other than repayment of the loans to the Creditor was a wrongful violation of the terms evidenced by the promissory notes and security agreements.

-26-

Further, the Creditor argues that to the extent that monies were diverted to the Debtor, he violated his duties as an officer and director of Rose Motors. According to the Creditor, the fact that the Debtor knew of the security agreements when he sold the company's assets and retained the money instead of paying the Creditor demonstrates that the Debtor intended to cause the Creditor harm, and such actions were without just cause.

First, the Creditor argues that because the Debtor was aware of the security agreements when he sold the assets of Rose Motors, he must have known that when he failed to pay the Creditor, he was causing injury to the Creditor, and, in fact, intended to harm him. The Court agrees that the Debtor was aware of the security agreements and promissory notes. In fact, the Debtor signed the $60,000 note (Creditor Ex. E) but refused to sign the $30,000 note or the two security agreements (Creditor Exs. C, D, & F). The Debtor's argument that he did not know of the existence of the security agreements or understand that the Creditor was claiming a security interest in the assets of Rose Motors is disingenuous. The fact that the Debtor was aware of these documents, however, does not mean that his act of paying other creditors while failing to pay this Creditor was both "willful" and "malicious" under § 523(a)(6).

The Court finds that the Creditor suffered an injury. The Creditor acquired a lien–albeit an unperfected one–on the assets of Rose Motors via the promissory notes and security agreements. When the Debtor paid other creditors prior to this Creditor and sold assets of Rose Motors on which the Creditor had a lien, an injury to property in which the Creditor had an interest resulted. *See Hi-Qual Roofing & Siding Materials, Inc. v. Ridsdale (In re Ridsdale)*, 286 B.R. 225, 233 (Bankr. W.D.N.Y. 2002), *aff'd sub nom. Collins v. Hi-*

-27-

*Qual Roofing & Siding Materials, Inc.*, Nos. 02-CV-0921E(F), 02-CV-0922E(F), 2003 WL

23350125 (W.D.N.Y. Dec. 18, 2003).

A wrongful violation of a promissory note or security agreement constitutes a breach

of contract. *See Trane Fed. Credit Union v. Conder (In re Conder)*, 196 B.R. 104, 112

(Bankr. W.D. Wis. 1995). Generally, debts for breach of contract, even for a debtor's

intentional breach, are not excepted from discharge under § 523(a)(6). *Koplin v. Ginsberg*

*(In re Ginsberg)*, Nos. 08 B 30836, 09 A 188, 2009 WL 2166688, at *3 (Bankr. N.D. Ill. July

15, 2009)*; Neiman v. Irmen (In re Irmen)*, 379 B.R. 299, 312-13 (Bankr. N.D. Ill. 2007);

*Lazzara*, 287 B.R. at 722. The Supreme Court in *Geiger*, however, did not preclude a breach

of contract claim from rising to the level of willful and malicious conduct. Rather, more is

required than just a "knowing breach of contract." *Geiger*, 523 U.S. at 62. The breach must

be both "willful" and "malicious." *Wish Acquisition, LLC v. Salvino (In re Salvino)*, 373

B.R. 578, 591 (Bankr. N.D. Ill. 2007) (noting that a breach of contract not involving tortious

conduct is outside the scope of § 523(a)(6)), *aff'd*, No. 07 C 4756, 2008 WL 182241 (N.D.

Ill. Jan. 18, 2008). "'Debtors who willfully break security agreements are testing the outer

bounds of their right to a fresh start, but *unless they act with malice by intending or fully*

*expecting to harm the economic interests of the creditor, such a breach of contract does not,*

*in and of itself,*'" preclude the discharge of the debt. *Conder*, 196 B.R. at 112 (*quoting*

*Barclays Am./Bus. Credit, Inc. v. Long (In re Long)*, 774 F.2d 875, 882 (8th Cir. 1985))

(emphasis added).

The evidence showed that the Debtor paid other creditors, including, among others,

himself, James, Sherry, and AFC, prior to paying the Creditor, a secured but unperfected lien

-28-

claimant. The Creditor argues that when the Debtor made these payments to other creditors and to himself, he was willfully injuring the Creditor because he had a superior claim to Rose Motors' assets by virtue of the security agreements. This, however, establishes only the "willful" element of § 523(a)(6).

Given the record and the testimony presented, the Court cannot infer that the Debtor intended to injure the property interests of the Creditor and cause him harm at the time he paid these creditors. That the Debtor preferred certain creditors by paying them before he paid this Creditor does not rise to the level of maliciously injury to the Creditor's property interests as required by *Geiger.* The Court finds that the Creditor failed to produce evidence to show that the Debtor's actions rose to the level of both "willful" and "malicious."

Next, the Creditor argues that the Debtor wrongfully diverted funds from Rose Motors to himself and James. (*See* Creditor Exs. S & T.) The evidence showed that from January 2005 through March 2006, Rose Motors transferred approximately $1,300,000 via check or wire transfer to the Debtor and James. (*Id.*) According to the Creditor, these transfers demonstrate willful and malicious conduct by the Debtor that harmed the Creditor. The Court finds that the Creditor failed to prove by a preponderance of the evidence a malicious injury to the Creditor intentionally committed by the Debtor.

The evidence showed that the $1,300,000 transferred from Rose Motors' accounts was used for corporate purposes and payment of corporate expenses. James explained in his uncontroverted testimony that the wire transfers went to AFC and MAFS, Rose Motors' floorplan finance companies, both of whom were perfected secured creditors, in order to ensure full payment of the monthly audit and to keep the line of credit open. Further, James

-29-

testified that all checks written to "cash" were for corporate purposes. James and Kelly both testified that Rose Motors paid cash to many of its creditors because those creditors would no longer accept checks from the company. In particular, Kelly testified that she took approximately $2,000 in cash per week with her to register titles and obtain licenses plates for the vehicles. In sum, the unrefutted testimony indicated that the checks made payable to James and the Debtor, the wire transfers, and the cash transactions were all for legitimate corporate purposes.

The Creditor failed to introduce evidence to show that the Debtor wrongfully diverted the corporate assets of Rose Motors for his personal use. While the Creditor pointed to certain transactions that he argues demonstrate a wrongful diversion of corporate funds, the Court finds that the evidence showed otherwise. Michael testified that the payments of $2,872 to the State Disbursement Unit (Creditor Ex. V) were not made for any legitimate business purpose of Rose Motors. He stated, however, that the Debtor had an ex-wife and children and was required to pay child support. These checks could have been the result of an order requiring Rose Motors, the Debtor's employer, to make the child support payments owed by the Debtor. Further, James testified that the March 2005 payment to Upland Mortgage in the sum of $690.60 (Creditor Ex. U) was the result of a second mortgage he took on his home in order to infuse more capital into Rose Motors. James testified that there was an agreement that Rose Motors would pay that mortgage. Finally, James testified that the 2005 payments made to Bank of America were for the cash advances that Sherry took on her credit card for Rose Motors. According to James, Rose Motors did not pay his or the Debtor's personal credit card debt. The Creditor did not refute any of this testimony.

-30-

Further, James testified that when Rose Motors closed its doors, AFC took possession of the remaining vehicles and sold them. Those proceeds were applied to the debt owed to AFC by Rose Motors. James also testified that the funds from the sale of Rose Motors' lease were used to process the sales transactions for the vehicles that Rose Motors sold. James explained that Rose Motors borrowed money from his sister to pay the taxes and fees in order to process the vehicle sales. Moreover, James stated that the "buy here-pay here" contract revenues were used to repay his sister for her loan to the company.

Based upon this evidence, the Court finds that the Creditor did not establish that the Debtor diverted corporate funds to himself or to James. Rather, the uncontroverted evidence showed that corporate funds were used to pay legitimate corporate expenses. Again, possible preferential payments under § 547(b) from the company to the Debtor and others are not the equivalent of the requisite elements for a willful and malicious injury excepted from discharge under § 523(a)(6).

According to the Creditor, the Debtor acted maliciously and with ill will toward him because Michael left Rose Motors. The Creditor states that the Debtor's maliciousness is evidenced by the fact that the Debtor stopped payment on the last interest check to him in March 2006. The mere fact that the Debtor stopped payment on this check does not indicate malice. The Creditor did not adduce any evidence to show why the Debtor stopped payment on the check. Rather, the Creditor argues that the Debtor did so because he was upset with Michael for leaving Rose Motors and selling automobiles elsewhere. Argument is not evidence, *Deady v. Hanson (In re Hanson)*, Nos. 09 B 04820, 09 A 00457, 2010 WL

-31-

4027743, at *3 (Bankr. N.D. Ill. Oct. 14, 2010), and the lack of any evidence here precludes the Court from finding that the Debtor's actions were malicious.

Additionally, the Creditor argues that the Debtor clearly intended to cause injury to him based on the way the Debtor handled the finances of Rose Motors. The Creditor points to the fact that Rose Motors was experiencing financial problems. Early in its business, the company was bouncing checks and had to borrow money from, among others, the Debtor, James, and Sherry. Further, there was testimony that the Debtor often gambled at work. While all of this may be true, the Creditor did not offer any evidence to show that the Debtor specifically intended to cause injury to him by not repaying him and by repaying other creditors of the company.

In sum, the Court cannot make the requisite findings under *Geiger* based on the evidence presented. Even though the Debtor's acts caused injury to the Creditor, there is no evidence to suggest that the Debtor acted with malice to cause injury. The Court can infer that the Debtor's actions were intentional, and thus willful, because Michael testified that the Debtor refused to pay the Creditor more than the interest he received. The Court finds, however, that the evidence failed to show that the Debtor intended the injury that resulted from his failure to repay the loans to the Creditor. Therefore, the Creditor has failed to demonstrate that his injury arose from both a "willful" and "malicious" act of the Debtor. *See Geiger*, 523 U.S. at 61-62. Accordingly, the Creditor's claim under § 523(a)(6) is hereby denied.

-32-

## V.  CONCLUSION

For the foregoing reasons, the Court finds that the Creditor has failed to establish by a preponderance of the evidence that the debt should be found non-dischargeable under § 523(a)(2)(A) or § 523(a)(6).

This Opinion constitutes the Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052.  A separate order shall be entered pursuant to Federal Rules of Bankruptcy Procedure 5003 and 9021.

ENTERED:

DATE: ___11/16/10___        _____
                                     **John H. Squires**
                              **United States Bankruptcy Judge**

cc:    See attached Service List

## SERVICE LIST

### Gus Rose v. Thomas Lothar Gelhaar
**Adversary Case No. 09 A 00504**

Donald B. Garvey, Esq.
Garvey & Associates, Ltd.
1S376 Summit Avenue-Unit C
Oak Brook Terrace, IL 60181

Teresa L. Einarson, Esq.
George Thomas, Esq.
Thomas & Einarson, Ltd.
29W204 Roosevelt Road
West Chicago, IL 60185

David E. Grochocinski, Esq.
Grochocinski Grochocinski & Lloyd, Ltd.
1900 Ravinia Place
Orland Park, IL 60462

William T. Neary, United States Trustee
219 S. Dearborn Street
Suite 873
Chicago, IL 60604